[Civ. No. 33071.   Second Dist., Div. One.   May 22, 1969.]

WILLIAM P. RALSTON, Plaintiff and Appellant, v. STATE EMPLOYEES' RETIREMENT SYSTEM, Defendant and Respondent.

William T. Hays and Harold L. Greene for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General and William L. Zessar, Deputy Attorney General, for Defendant and Respondent.

WOOD, P. J.—William P. Ralston, a retired employee of the Department of Corrections of the State of California,

petitioned the superior court for a writ of mandate compelling the State Employees' Retirement System to pay him a disability retirement allowance of 50 percent of his final compensation as provided in section 21292.8 of the Government Code. The court found that the evidence supported the findings of the Board of Administration of the State Employees' Retirement System that petitioner did not have "custodial duties" within the meaning of section 21292.8 of said code. Petitioner appeals from the judgment denying his petition.

Appellant contends that while he was an employee in the Department of Corrections he had custodial duties within the meaning of section 21292.8 of the Government Code. That section provides: "Upon retirement of a member who is an officer or employee in the Department of Corrections having custodial duties for industrial disability he shall receive a disability retirement allowance of 50 percent of his final compensation plus an annuity purchased with his accumulated additional contributions, if any, or, if qualified for service retirement, he shall receive his service retirement allowance if such allowance after deducting such annuity, is greater." Since the enactment of said code section in 1961, the State Employees' Retirement System has interpreted that section as not being applicable to employees of the department whose duties are not primarily the securing of physical custody of prisoners. The Attorney General also has given that interpretation to the section (38 Ops. Cal. Atty. Gen. 137).

From 1945 to 1949 petitioner was employed in the Department of Corrections in the position of "Parole Agent I"; from 1949 to 1956, he was Parole Agent II; and from 1956 to March 18, 1966, he was Parole Agent III. On February 15, 1966, he sustained a heart injury, and by reason thereof his employment with the Department of Corrections was terminated on March 18, 1966. He was awarded ordinary disability retirement (Gov. Code, §§ 21021-21025 and 21295-21297), and he is receiving allowances for such retirement.

Petitioner applied for industrial disability retirement allowances as provided for in section 21292.8 of the Government Code on the ground that he had been an employee "having custodial duties" within the meaning of that section. The executive officer of the State Employees' Retirement System denied the application. Thereafter, a hearing upon the application was held before a hearing officer of the Office of Administrative Procedure.

Documentary evidence presented at the hearing included detailed specifications of the state personnel board for various classifications of parole agents. The specifications are similar with the exception that as to the higher classifications (e.g., Parole Agent III) the required qualifications include more experience and the duties entail more responsibility, such as supervision of employees in the lower classifications. Some of the required qualifications are education and experience in sociology and criminology. An example of the "Typical tasks" specified for the positions is that of Parole Agent II, shown in a footnote.[1] It is to be noted that a part of such specification of duties is that the parole agent "investigates cases of parole violators, compiles evidence required to effect the suspension of parole and *apprehends* violators for return to custody." (Italics added.)

Petitioner testified in part as follows: As Parole Agent, grade II, his duties were the same as grade I, except that he assumed supervisory duties. His duties in grade III included supervising the staff, assisting and training subordinates,

---

[1] "Performs specialized and unusually responsible duties in parole work; supervises parole agents performing placement and parole work; trains staff, evaluates their performance, and takes or recommends appropriate action; instructs subordinates as to the policies and standards of individual treatment of the adult paroling authorities; reviews, analyzes, and evaluates case histories of parolees or out-patients released to programs in other states, and proposed programs of parolees from other states to be supervised in California; makes confidential investigations of cases of paroled or discharged felons who have made application for commutation of sentence or pardon; makes reports and recommendations on executive clemency matters; evaluates institutional experience and training in terms of field placement and recommends and develops employment programs; performs specialized research and treatment program analyses; may carry a reduced case load; counsels parolees or out-patients, helps them to understand their problems and adapts the treatment program to the individual; interviews friends and relatives of parolees and adults on parole and interprets to them the parole treatment program; investigates parole plans to determine acceptability; keeps informed as to the policies and standards of the adult paroling authorities and the Department of Corrections; works with and secures the cooperation of social, law enforcement, recreational, religious, educational and other agencies concerned with rehabilitation of parolees or out-patients; recommends to the adult paroling authorities changes in individual conditions of parole required for effective rehabilitation; utilizes case work methods in the supervision of parolees or out-patients and makes individual diagnoses and progress reports indicating case prognosis; investigates cases of parole violators, compiles evidence required to effect the suspension of parole and apprehends violators for return to custody; makes special investigations for the adult paroling authorities; as required, acts for the Parole Agent III, Adult Parole, in his absence; prepares case histories, dictates correspondence, and prepares reports."

making special investigations for the Adult Authority, ordinary arrests, approving or disapproving reports, making arrests and transporting prisoners, and returning parole violators to prison. His standard equipment was handcuffs, restraint belt, badge, brief case, and business cards. He was "on 24-hour call" if parolees, the police, or his subordinates wanted to contact him. Sometimes he would go to the police station to see whether any parolees had been taken into custody. Between 1960 and 1964 he and his subordinates arrested 697 parolees in the San Diego area. He made about 100 of those arrests personally, and he authorized or approved the other arrests.[2] In the last two years of his employment he and his agents had an average of 5 to 10 parolees in custody each week. He questioned parolees who had been taken into custody, handcuffed them, searched them, and transported them to jail and to prison. He was in charge of the Nalline Testing Center, was present when narcotic offenders were tested, would order offenders booked, would handcuff them if they became recalcitrant, and, if they did not report for the tests he searched for them and took them into custody, which included "chasing them over back fences," grabbing them as they came out "the back door," and so forth. Prior to 1964, he and his staff transported parole violators from San Diego to the prison in Chino (thereafter the sheriff assumed such transportation). About 20 to 30 parole violators were returned to prison each month. There were occasions when, pursuant to an all-points bulletin issued by the Adult Authority, he apprehended parole violators. On occasions when he saw a violator on the street, he jumped out of the car and arrested the violator. Some of the violators resisted arrest. In the last two years of his employment, about 20 to 30 percent of his time was allocated to having persons in custody. He transported persons in custody to California from other states, including New York (twelve times), Florida, and Arizona. He carried a gun on occasions.

Mr. Miller, who is a regional administrator in the Department of Corrections and who was petitioner's supervisor for a few years in San Diego, testified in part as follows: Petitioner's duties as Parole Agent II and III were to manage the

---

[2]He testified that he had been an officer for 12 years prior to becoming a parole agent, and that he arrested and transported to prison more felony offenders in his first six months as a parole agent than he had in the 12 years as an officer.

San Diego office, to supervise the parole agents there, to hire and train the agents, and to do liaison work with other agencies. In the Parole and Community Service Division of the Department of Corrections, "custodial duties" means the supervision, counseling, custody, arrest and transportation of parolees. Petitioner's supervisory duties were two-fold—to supervise the staff and to supervise parolees. His primary duty was to supervise the staff. Petitioner performed custodial duties such as arresting, restraining, and transporting parolees. As regional administrator he (witness) did not know specifically, in the absence of time records, what duties petitioner performed. There are about 27,000 prisoners and about 15,000 parolees; and the handling of parolees constitutes a large portion of the responsibilities of the Department of Corrections. The duties of Parole Agent II and III are substantially the same. The supervisor (Parole Agent III) participates in the apprehension of parole violators. The parole agent's manual distributed by the department requires the parole agent to take into custody certain parole violators and suspected violators. He (witness) visits the San Diego office about twice a month and he knows, personally, and from reports, that petitioner on many occasions had persons in custody and transported them from out-of-state and within the state. Parole agents and parole officers are considered to be peace officers,[3] with the administrative mandate that they only use such enforcement powers as may be necessary to their performance as parole agents. They are on "24-hour call" and assist law enforcement agencies in identifying suspects.

In a proposed decision, the hearing officer determined that petitioner, during his employment with the department, did not have custodial duties within the meaning of section 21292.8, and that he was not entitled to the disability retirement allowance provided for therein. The board, in its decision, adopted the proposed decision.

On the hearing of the petition in the superior court, the administrative record was received in evidence. The court found that the decision of the board was supported by the findings and that the findings were supported by the weight of the evidence. A conclusion of law was that the petitioner

---

[3]Penal Code, section 817, defines "peace officer" to include "any parole officer of the State Department of Corrections."

did not have custodial duties within the meaning of section 21292.8 of the Government Code.

Appellant contends that he had custodial duties within the meaning of said code section. He argues that pension provisions should be liberally construed in favor of the applicant (*Gibson* v. *City of San Diego,* 25 Cal.2d 930, 935 [156 P.2d 737]; *Dillard* v. *City of Los Angeles,* 20 Cal.2d 599, 602 [127 P.2d 917]); and that since parolees are, in contemplation of the law, at all times in legal custody, the very essence of a parole agent's duties is custodial.

Respondent contends that the Legislature, in adding section 21292.8 (and §§ 21020.8 and 21290.8) to the Government Code in 1961, did not intend to include parole agents in the category of employees of the department "having custodial duties." In this connection, respondent refers to an opinion of the Attorney General, rendered in 1961 (38 Ops. Cal. Atty. Gen. 137), wherein said section 21292.8 was interpreted as being inapplicable to parole agents and other departmental employees whose primary function is not the custody or safekeeping of parolees. Respondent argues that since the Attorney General has so interpreted the section, and since the board of administration also has made such interpretation of the section, those interpretations should be followed.

Sections 20000 to 21500, inclusive, of the Government Code pertain to the state retirement system. Those sections are in title 2, division 5, part 3, chapter 1, article 1, of that code. Section 20013, and several following sections, define various members of the system.

Section 20016 states that "Prison member" includes employees appointed by the Governor, or the director of corrections, or the Adult Authority, and employed in the state prisons or facilities of the Department of Corrections or in the division of adult paroles as officers, and all parole agents or officers employed by the Adult Authority.

Section 20017 states that "Patrol member" includes all members employed in the Department of the California Highway Patrol whose principal duties consist of active law enforcement service, except those whose principal duties are those of a telephone operator, clerk, stenographer, machinist, mechanic, or otherwise clearly do not fall within the scope of active law enforcement service, even though such a person is subject to occasional call to perform duties within the scope of active law enforcement service. Other sections give definitions

of miscellaneous member, forestry member, law enforcement member, and narcotic enforcement member.

Sections 21290 to 21290.8, inclusive, relate to allowances upon retirement for nonindustrial disability of various members such as those members hereinabove mentioned. In substance said sections provide that each such member upon retirement for nonindustrial disability shall receive his service retirement allowance.

Section 21292 (added in 1945) provides in substance that a patrol member upon retirement for industrial disability shall receive a disability allowance of 50 percent of his final compensation in addition to other benefits. A similar additional allowance is provided for forestry members (§ 21292.5, added 1947), narcotic enforcement members (§ 21292.7, added 1951), and law enforcement members (§ 21292.75, added 1951).

In 1961 the Legislature added section 21020.8 which provides that "The provisions of this article [article 3] applicable to patrol members are also applicable to members who are officers and employees in the Department of Corrections *having custodial duties.*" (Italics added.) Article 3 contains section 21292 which provides, as next above stated, that a patrol member shall receive an industrial disability allowance of 50 percent in addition to his service (ordinary) retirement allowance.

Also in 1961, the Legislature added section 21292.8 which, as hereinabove stated, provides in substance that upon the retirement for industrial disability of a member of the Department of Corrections having custodial duties he shall receive a disability allowance of 50 percent of his final compensation in addition to his service (ordinary) retirement allowance.

It thus appears, from code sections above referred to, that "prison members" includes parole agents as employees of the Department of Corrections, and that "patrol members" includes employees of the Department of California Highway Patrol whose *principal* duties consist of active law enforcement, except telephone operators, clerks, etc. Such a member upon retirement for *nonindustrial disability* is entitled to his *ordinary* service retirement allowance. The petitioner in this case (Ralston) is receiving such a retirement allowance. Also, as shown by code sections above referred to, in 1945 there was legislation whereby a *patrol* member retiring for *industrial* disability would receive an additional 50 percent disability

allowance. In 1961, as above shown, there was legislation which made such additional 50 percent benefit for industrial disability applicable to *prison* members—which included Department of Corrections employees "having custodial duties." The petitioner herein (Ralston), as a retired parole agent (in Department of Corrections) receiving the nonindustrial disability allowance, seeks the additional allowance for industrial disability on the basis that he, as a parole agent employed in the Department of Corrections (a prison member), had custodial duties.

The legislation in 1961 does state, as above shown, that the additional benefit is applicable to members who are employees in the Department of Corrections "having custodial duties." The respondent herein, State Employees' Retirement System, asserts that such provision is applicable only to employees whose duties are *primarily* custodial.

The legislation which so extended the additional benefit to prison members (i.e., said sections 21020.8, 21290.8, and 21292.8) was added by Statutes 1961, chapter 905; and the origin of that legislation was Senate Bill 292.

When that bill was introduced the proposed sections 21020.8, 21290.8, and 21292.8 were similar to the sections as finally enacted, except that the sections contained the words "prison members" instead of the words "members who are officers and employees in the Department of Corrections having custodial duties." (For example, the bill provided in part: "Section 21020.8 is added to the Government Code, to read: 21020.8. The provisions of this article applicable to patrol members are applicable to *prison members*." (Italics added.) As enacted, section 21020.8 provided: "The provisions of this article applicable to patrol members are also applicable to members who are officers and employees in the Department of Corrections having custodial duties.")

Section 20016, which was in existence when the aforementioned changes were made in the Senate bill, in effect states that "prison member" includes all employees appointed by the Governor, or the director of corrections, or the Adult Authority, and employed in state prisons or facilities of the Department of Corrections. According to respondent's argument, the Legislature, in limiting the disability retirement allowances to employees "having custodial duties" rather than to "prison members" generally, intended that the allowances should extend only to those employees whose

duties are primarily custodial. This interpretation is in effect the same as the interpretation in the Attorney General's opinion [38 Ops. Cal. Atty. Gen. 137], i.e., that parole agents are not employees having custodial duties within the meaning of section 21292.8. In that opinion, the Attorney General referred to the aforementioned legislative history of Statutes 1961, chapter 905 [S.B. 292], and said: "It is obvious from the legislative history of chapter 905 that not all prison employees or prison members of the retirement system are to be accorded the benefit established by it. Since all prison members under the rules of the Director of Corrections have some custodial functions, and all may be called upon to act as custodial employees in time of emergency (see rules D4202 and D5210), but only a limited class of prison members were to have the new benefit, the only conclusion that can be reached is that the legislation extends only to those employees whose duties are primarily custodial." The opinion stated further: "As the primary function of parole agents, men or women, is not custodial they are not entitled to the benefit provided by chapter 905 of the Statutes of 1961."

The legislative history of the 1961 statute providing for the additional benefit shows that at first the proposed legislation (Senate Bill 292) designated prison members as the ones to receive the benefit. The Legislature changed the proposed bill by omitting "prison members" as the beneficiary and substituting therefor "employees in the Department of Corrections having custodial duties." The word "primarily" (referred to by respondent) is not in the sections which provided for such additional allowance. It is to be noted that in the definition of "patrol members," in section 20017, it is stated that such a member includes all members employed in the Department of California Highway Patrol whose *principal duties* consist of active law enforcement service, except those whose principal duties are those of a telephone operator, clerk, etc. It thus appears that in providing for the additional allowance for a "patrol member," the Legislature (in view of such definition) did limit such allowance to the patrol members whose principal duties consisted of active law enforcement, and excluded certain employees who were not to receive the allowance. In enacting sections 21020.8 and 21292.8, which provided for the additional allowance for a member who is an employee in the Department of Corrections having custodial duties, the Legislature did not expressly restrict the allowance

to those whose duties were principally or primarily custodial. If such a restriction had been intended it would seem that a provision therefor would have been made, especially in view of the restrictive provision with reference to "patrol member."

In the present case, there was evidence that the specifications of the personnel board for the position of parole agent provided, among other things, that the agent's duties included the apprehension of parole violators and returning them to custody. The manual of the department required that parole agents take parole violators in custody. There was uncontradicted evidence to the effect that petitioner actually performed duties as follows: Between 1960 and 1964 he and his subordinates arrested 697 parolees, of whom he arrested 100 personally, and he authorized the other arrests. His standard equipment included a badge, handcuffs, and a restraint belt; and he was "on 24-hour call" if parolees or the police wanted to contact him. He had 5 to 10 parolees in custody each week. He questioned, searched, handcuffed, and transported to jail parolees who had been taken into custody. He supervised the Nalline Test Center and handcuffed and restrained parolees who became recalcitrant at the tests, and he searched for, and took into custody, those who were required to report for, but who did not report for, the tests (which included chasing them and forcibly apprehending them). Prior to 1964, he and his staff transported about 30 parole violators a month from the San Diego area to the prison in Chino. Pursuant to all-points bulletins, he apprehended parole violators. Some of the parole violators resisted arrest. About 30 percent of his time was allocated "to having persons in custody." He also transported persons in custody to California from other states, including New York (twelve times), Florida, and Arizona.

■ Since the parolee is at all times in constructive custody or "custodia legis,"[4] custodial duties are a substantial function of a parole agent.

---

[4]In *People* v. *Denne*, 141 Cal.App.2d 499, 508 [297 P.2d 451], with reference to the continuing custody of parolees, it was said: "From the statutes and cases last discussed, it is clear that the liberty accorded a parolee is partial and restricted. The granting of parole does not change his status as a prisoner. The parolee is not discharged but merely serves the remainder of his sentence outside rather than within the prison walls. The parole system, as an enlightened penological technique, enables him to pay his debt to society in a prison without bars. But he continues at

Petitioner herein was an employee of the Department of Corrections having custodial duties within the meaning of section 21292.8 of the Government Code.

The judgment is reversed with directions that the superior court issue a peremptory writ of mandate compelling the Board of Administration of the State Employees' Retirement System to find that petitioner William P. Ralston is an employee having custodial duties within the meaning of section 21292.8 of the Government Code.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied June 20, 1969, and respondent's petition for a hearing by the Supreme Court was denied July 16, 1969.

---

all times to remain in penal custody, the same as the prisoner allowed the privilege of working on the prison's 'honor farm.' Parole has simply pushed back the prison walls for him, allowing him wider mobility and greater personal opportunity while serving his sentence. The additional liberty conferred on the parolee is the result of a decision of the Adult Authority, an administrative agency which is a component part of the Department of Corrections. [Citation.] Rules and regulations for the conduct of paroled convicts are rules and regulations for the control of prisoners. [Citation.] The enforcement of these rules while the parolee is at large is the responsibility of the parole officer, a functionary of the administrative agency charged with supervising the conduct and charting the social progress of the parolee. . . . His supervision of the parolee is of necessity a close one, since it bears strong analogy to that of a jailer to his prisoner, though the area of operations has been vastly extended." (See 39 Cal.Jur.2d, Prisons and Prisoners, § 118, p. 722.)